THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.*
JORGE RAMOS PIZARRO, Defendant and Appellant.

No. CR-66-499.      Decided May 10, 1968.

*E. Armstrong Watlington, Enrique Miranda Merced,* and *Edna
Abruña Rodríguez* for appellant. *J. B. Fernández Badillo,
Solicitor General,* and *Héctor R. Orlandi Gómez, Assistant
Solicitor General,* for The People.

### JUDGMENT

Appellant was convicted of robbery committed as a result
of an assault by force of arms to rob the cash register of a
restaurant located in the Sabana Seca Ward of Toa Baja.

The only error assigned in this appeal is that appellant's
guilt was not established beyond a reasonable doubt. The
assignment rests on the appellant's identification.

The evidence for the prosecution reveals beyond a reason-
able doubt that the assault was committed by two persons,
and that a robbery of money was committed. The employee
in charge of the cash register testified that the person who
opened it was tall and fat, but he could not identify his face.
It appears from the record that appellant was wearing a
mask. A second witness identified appellant as the person
who took the money out of the cash register. He described
before the jury the manner in which he was wearing the

mask, and which of his features, however, were visible. He described his hair, eyebrows, and hands; he said that the region of the eyes and nose were visible, the eyebrows were very bushy and the hair was straightened and greasy. Immediately after the events, he identified appellant from a group of photographs which the police showed to him. Although submitted to a vigorous cross-examination, the witness stated over and over again without hesitancy before the jury that appellant was the person who had committed the robbery.

Defendant did not present any evidence. The trial court had refused before, as a matter of law, to decree his acquittal on the grounds of the insufficiency of the evidence. The court believed that there was enough evidence for the jury to deliberate. It assumed this same position subsequently in deciding a motion for new trial. The jury found him guilty of the crime charged. Appeal has been taken from the judgment as well as from these pronouncements denying acquittal and new trial.

As a matter of law, the decision of the trial court refusing to order the jury to acquit appellant because of the insufficiency of the evidence was correct, and the denial to grant a new trial on the same grounds was also correct. The evidence for the prosecution, undisputed by any other, gave grounds for placing the case under the consideration and deliberation of the jury. This being so, there only remains in this case the weighing, credibility, weight, and evaluation by the jury of the evidence for the prosecution. It is not our duty to substitute the jury in that function. In addition to the information which we have from the transcript of the oral evidence alone, the jury also had the benefit of seeing defendant, observing his reactions, appraising the witness, his manner of testifying, comparing, looking at defendant, how correct or not his identification could be. No evidence for the defense was presented, which would tend to contradict

the testimony heard and observed. It is the doubts of the jury which must be overcome as to the degree and extent in which an identification of appellant was produced. The jury was duly charged on the particular, the reasonable doubt, and thus charged, it put an end to its doubts and returned a verdict. There are no grounds for disturbing the same on appeal.

The judgment rendered by the Superior Court, Bayamón Part, on September 29, 1964, which convicted appellant of the crime of robbery, is affirmed.

It was so ordered and decreed by the Court as witnesses the signature of the Chief Justice, who did not participate herein.

Mr. Justice Pérez Pimentel and Mr. Justice Ramírez Bages dissented in a separate opinion.

(s) LUIS NEGRÓN FERNÁNDEZ
*Chief Justice*

I attest:

(s) JOAQUÍN BERRÍOS
*Clerk*

—O—

Mr. Justice Ramírez Bages, with whom Mr. Justice Pérez Pimentel concurs, dissenting.

San Juan, Puerto Rico, May 10, 1968

I dissent because, in my opinion, the evidence presented is not sufficient to support the conviction, and "does not establish [appellant's] guilt beyond a reasonable doubt", as my colleague, Mr. Justice Dávila, stated in *People* v. *Serrano Nieves*, 93 P.R.R. 55, 59 (1966), with whom the other justices, who uphold with him the judgment in the case before us, concurred.

It is stated in the judgment of this case that as to the weighing, credibility, weight, and evaluation of the evidence for the prosecution, "It is not our duty to substitute the jury in that function."

In *Serrano Nieves, supra,* however, the writer of the opinion did nothing else but weigh the evidence presented and which was considered by the jury, to reach a conclusion different from and contrary to the one reached by the jury, that is, that the evidence in that case did not establish the guilt beyond a reasonable doubt.

A careful study of our opinion in *People* v. *Ortiz,* 86 P.R.R. 431, 443 (1962), reveals that this Court, speaking through Mr. Justice Santana Becerra, settled a conflict in the evidence in a manner contrary to the decision of the jury, and later it applied certain principles of law which were set forth in *People* v. *Pérez,* 79 P.R.R. 460 (1956).[1] In *Ortiz, supra,* a jury found appellant guilty of involuntary manslaughter under an information of driving a motor vehicle so negligently and carelessly, at excessive speed, without taking into consideration the conditions and width of the road, that he ran over Luis Tomás Arce. In his opinion Mr. Justice Santana Becerra made a minute analysis of the testimony of each witness, he weighed the evidence in the same manner the jury did, and he concluded that "Analyzing all those elements of judgment afforded by the evidence, whether taken as a whole or only the prosecution evidence, with the full credibility which the jury may have given to the latter, in the light of the applicable rule of law we do not believe that The People proved its case, at least beyond a founded doubt."

---

[1] It is obvious that in every case there is a range of law within which all the conflicts of evidence are considered and settled. The standards of law set forth in *Pérez, supra,* are to the effect that the speed limit of a vehicle is determined by various factors in addition to the speed limit prescribed by law.

In *People* v. *Ramos*, 43 P.R.R. 68, 69 (1932), we stated that: "Ordinarily we do not disturb the findings or verdict of a jury convicting a defendant, especially as regards the credibility of the witnesses; but we can, as an appellate court, determine whether there was manifest error in the weighing of the evidence, or whether the latter is of such a nature that it does not justify the verdict or is insufficient to sustain a judgment of conviction."

In *People* v. *Plata*, 38 P.R.R. 80 (1928), we reversed the jury's verdict of guilty in a theft case because "The only evidence presented at the trial was that of the district attorney and its examination convinces us that the jury committed manifest error in weighing it and basing on it a verdict of guilty, for there is nothing in it to show the guilt of defendant Plata as principal or accomplice in the crime."

In *People* v. *Vázquez*, 33 P.R.R. 188 (1924), we reversed the judgment of conviction of the crime of involuntary manslaughter because "The evidence did not tend to support the information as amplified, is our real reason for reversal."

In *People* v. *Rivera*, 25 P.R.R. 757 (1917), we reversed the conviction of the crime of murder in the first degree because "the circumstances above outlined [a summary of the testimony of each witness] without more, do not show the deliberation and premeditation necessary to sustain a conviction of murder in the first degree."

In *People* v. *Ortiz*, 22 P.R.R. 630 (1915), appellant was accused of the crime of passing counterfeit money consisting in his paying the price of two newspapers and some chickens with counterfeit money. In reversing the jury's verdict of guilty we stated that "We think the evidence as a whole, including both transactions, is entirely insufficient to sustain the verdict."

In *People* v. *Cofresí*, 22 P.R.R. 696 (1915), we reversed a judgment of conviction of the crime of conspiracy to set

fire to insured goods. We stated that "at most, would be very scant proof."

In *People* v. *Vega*, 15 P.R.R. 317, 329 (1909), we reversed a conviction of murder in the first degree because, after analyzing and weighing the evidence which the jury considered, we concluded that "To our minds the circumstances proven on the trial were not sufficient in themselves, nor well enough connected with each other to justify a verdict of conviction . . . until his guilt is proven by competent evidence beyond a reasonable doubt, he cannot be punished for any crime."

See, also, *People* v. *Tirado*, 69 P.R.R. 361, 367 (1948); *People* v. *Ramírez*, 22 P.R.R. 440 (1915); *People* v. *Robles*, 13 P.R.R. 299, 306 (1907); *People* v. *González*, 13 P.R.R. 34 (1907).

In view of the foregoing, it is evident that this Court ought to disturb the verdict of a jury when, after analyzing and weighing the evidence which was presented to the jury, it concludes that it is insufficient to support the conviction, or does not establish the guilt beyond a reasonable doubt.

The question before us in this case concerns appellant's identification as author of the crime of robbery of which the jury found him guilty. If the evidence of said identification is vague, doubtful, incredible or insufficient at law, the relation of appellant with the crime has not been proven beyond a reasonable doubt. *People* v. *Cullota*, 207 N.E.2d 444 (Ill. 1965); *People* v. *Barney*, 208 N.E.2d 378 (Ill. 1965); *Commonwealth* v. *Miller*, 201 A.2d 256 (Penn. 1964); *People* v. *Bryan*, 188 N.E.2d 692 (Ill. 1963); *Phillips* v. *State of Texas*, 297 S.W.2d 135 (Texas 1957).

In the light of the foregoing, with respect to the applicable rule of law, let us examine the evidence presented in this case as to the identification of the author of the offense of which the jury found appellant guilty. Said evidence was the following:

The owner of the bar-restaurant, in which the offense of robbery was committed in this case, was not present when the facts occurred on the night of September 22, 1966. The employee, Ramón Rodríguez Miranda, who was attending the bar of the establishment that night, was at the bar when three individuals came in and told him "Do not move" and he stayed where he was "and I could not look at them." He testified that they opened the cash register and took $200; that the one who opened the cash register was tall and fat, but he could not identify his face. He was not impressed by any physical detail of the person. The one who opened the cash register aimed at his ear with a revolver which had a large and black barrel; that the other one entered the kitchen; he did not see him well; that in order to reach and open the cash register, the thief climbed over the railing of the bar, that the other employee, Federico Ortiz Cruz, was in the kitchen. He said that the light in the establishment was faint.

Ortiz Cruz testified that he was working in the kitchen of the establishment "when he sees Ramón Miranda being aimed at with a revolver, thus, close to the ear, a big, black revolver with a large barrel. I kept on looking, when I noticed that he was taking out the money from the cash register, he was . . . with his left hand he was taking out the money, he used his fingernails, when he pushed the cash register back, he began to move backwards, slowly. When I moved to help Ramón Miranda, the other one grabbed me and told me: 'Do not move because I will shoot you', I did not know what to do, I was holding a knife, preparing some hors d'oeuvres, and I had to throw it aside." He identified appellant present in the court as to the one who aimed at Rodríguez with a revolver; that he had a black revolver with a long barrel; that the other one was aiming at him, Ortiz, with a revolver with a short, black barrel. His testimony continues, in part, thus:

"Q. And how did you say he opened the cash register?

"A. With his fingernails. With a long fingernail that I could also see, and also since I am at about this distance, from the kitchen to the cash register.

"Q. Did you see, if you actually did see, that the defendant took some property from the cash register?

"A. Well, he took from the cash register the $200 in bills which were there.

.    .    .    .    .    .    .    .

"Q. True. You saw the person who took the money from the cash register?

"A. Yes.

"Q. Who was that person?

"A. That gentleman.

"Q. He points to defendant. For the purposes of the record.

.    .    .    .    .    .    .    .

"Q. Did you offer any resistance to these persons who aimed at you with a revolver?

"A. When they aimed at Moncho, when I was going to help Ramón, the other one aimed at me in the kitchen, when I was preparing the hors d'oeuvres. About three minutes later they went out and left.

.    .    .    .    .    .    .

"Q. Sit down. Well sir, describe to me, in detail, what you saw that night, the gentleman who was aiming at Monchito.

"A. Yes, sir.

"Q. Describe to me his clothes, his physique.

"A. He was wearing a gray shirt.

"Q. Go on.

"A. He was wearing a mask which covered up to here, and this was visible.

"Q. Mask? Describe to me that mask.

"A. It came up to here, but this here was visible.

"Q. Let me see if my handkerchief is clean.

"A. Your handkerchief is not a mask.

"Q. Yes.

"A. It was not placed in that manner, and it was torn.

"Q. Do you have a handkerchief there? Well, see if you can simulate with your hands how it was.

"A. He had it on, but it was all visible.

"JUDGE: For purposes of the record, he places his hands around his eyes.

"A. Like this more or less, and this here covered.

"JUDGE: Now, he moves his hands back towards the nape.

"MR. TORRES: He places his hands from the jaw, that is, from the chin up to the forehead, and he says it is towards the back part, that is, it covered the nose, mouth, part of the chin and part of the forehead.

"A. Like this, towards the back.

"Q. How was the mask he had on, and from where?

"A. He had it placed from here towards the back, thus.

"Q. Where did it begin?

"A. It began here, and reached here, thus.

"Q. Thus, covered up to here?

"A. Yes.

"Q. So then it reached down here?

"A. Yes, but it had some holes down here.

"Q. It reached down here, and you saw the two holes?

"A. One could see them completely.

"Q. Did he have one for breathing?

"A. Yes.

"JUDGE: He points out the region around the eyes, when he says that one could see all this.

"Q. Did he have the nose and everything covered?

"A. His nose, eyes and everything was covered, as I am telling you.

"Q. What color was the mask?

"A. Black.

"Q. What else did you observe of that person?

"A. I recognize that person by the fact that his hair was straightened.

"Q. Tell me all the details which you observed and remember of that person.

"A. When I identified him, I did so by his height and physique.

"Q. Forget when you identified him, I want to know what you saw that night.

"A. I saw that night the same person I identified.

"Q. I want to know what you saw that night, indicate what you saw of that person.

"A. I saw the revolver.

"Q. Did he have a mask on?

"A. He had a revolver.

"Q. A revolver?

"A. And I saw his mask hanging.

"JUDGE: When he says that the mask was hanging, he points to his chest.

"Q. The mask went down to where?

"A. Here, yes sir.

"JUDGE: He points to his waist.

"A. I am pointing to this.

"Q. Let us see if the record is clear. It was a mask which started from the forehead, with two holes through which one could see his eyes, nose, which covered his face and hung down up to what part?

"A. Up to here.

"Q. We could say, the waist.

.    .    .    .    .    .    .    .

"Q. Since it is raised too much. So then, you say that this gentleman who was aiming at Moncho had on a gray shirt and a mask which covered his face from his forehead to his waist, right? Was that the only thing which you observed of that person?

"A. Yes.

.    .    .    .    .    .    .    .

"Q. Tell me whether you saw the color of the eyes.

"A. I saw his eyebrows completely.

"Q. Were his eyes green, blue, gray, yellow, brown, black, or of those which change color?

"A. Well, I could not identify his eyes because what I only saw was this.

"Q. I am asking you whether you know the color of his eyes.

"A. No, sir, I do not know.

"Q. Tell me whether you saw the shape of his mouth and nose.

"A. Well, I told you the only thing I saw, I did not see anything else.

"Q. Did you see the shape of his nose, if he has a long nose, a short nose, a flat nose?

"A. That . . . the only thing I noticed as I identified it; no I did not notice the shape of the nose that night.

"Q. You do not remember either the shape of the mouth, whether it was a small, or wide mouth, were his lips thick or thin?

"A. I saw him, I repeat.

"JUDGE: He cannot, go on.

"Q. You did not see the mouth either, or if his hair was straight, curly or blond?

"A. His hair was straightened.

"Q. How long was his hair?

"A. Well, his hair was straightened, he had it set.

. . . . . . . .

"Q. Tell me, sir, I was asking you whether you remember the mouth of this gentleman whom you saw on September 22, 1962, and who according to you took the money?

"A. I could not see his mouth because as I told you the only thing I could see was his nose.

"Q. How was his chin?

"A. I did not see it either.

"Q. How were his cheeks?

"A. I only saw this.

"Q. You did not see the cheeks either?

"A. No, sir.

"Q. Did you see the ears?

"A. This only.

"Q. You did not see the ears either?

"A. Nothing else.

"Q. You did not see them either. You say his hair was straightened?

"A. Yes, sir, it was straightened.

"Q. Was it combed with a lot of grease?

"A. His hair was straightened.

"Q. As when one puts a lot of grease on?

"A. Yes.

"Q. Tell me about any personal mark of that person which you remember.

"A. Well, the only thing I saw was that.

"JUDGE: What did he answer?

"A. That as to a mark, the only mark I saw was . . .

"Q. Of the mask?

"A. Of the mask.

"Q. That is, you cannot recognize that person because he had a mask on?

"A. I recognize him by this.

"Q. Why by this?

"A. By his eyebrows.

"Q. How were his eyebrows?

"A. Bushy.

"Q. Do not look at him now.

"A. I saw them bushy.

"Q. Are your eyebrows bushy, or how are they?

"A. Yes, a little.

"Q. Many people have bushy eyebrows, for example, the Clerk, the Prosecuting Attorney; I do not because I hardly have any eyebrows. Tell me whether or not he had a mustache.

"A. I did not see his mustache.

"Q. So then what you saw were two eyes through some small holes?

"A. Not small, they were quite big.

"Q. How big?

"A. As I told you.

"Q. Draw them for me there.

"A. As I told you, I do not know how to draw.

"Q. You did not draw the Proville Bar for me, yesterday. Well, tell me, since you insist on that his eyebrows were bushy, from where to where did those eyebrows extend, did they extend way towards the back or up to the middle?

"A. They were like this.

"Q. For the purposes of the record, he lifts his hands up to that which is known as the temple, that is, up to where his eyes end, way to the back, about an inch.

"A. Yes.

"Q. Tell me, was it true or not that when you were coming out of the kitchen, you were aimed at and you stepped backwards like this?

"A. I beg your pardon.

"Q. If it was like this, yes or no?

"JUDGE: Let him explain.

"A. I must explain.

"Q. The question is whether you stepped back?

"A. Yes, sir; at that moment I stepped back.

"Q. How far did you step back, in the kitchen?

"A. About from here to the table.

"Q. That table in the middle?

"JUDGE: About twelve feet.

"Q. So then, when you came to the door, you stepped back about twelve feet immediately after they aimed at you?

"A. Certainly.

"Q. And you stayed there?

"A. I had to stay there.

"Q. How long or till when did you stay twelve feet away in the kitchen with your hands up?

"A. From three to five minutes.

"Q. How long did the whole situation last, from the time these two persons, as you say, with two masks came in and assaulted you?

"A. Well, when . . .

"Q. How long did that take?

"A. From three to five minutes.

"Q. So then, the assault you are speaking of, the alleged assault, lasts from three to five minutes, and you are in the kitchen with your hands up from three to five minutes?

. . . . . . . .

"Q. Tell me whether or not that kitchen has a door.

"A. It has a door like this.

"Q. Can it be closed?

"A. Like this.

"Q. And the person who came up to you in the kitchen closed the door so that nobody could notice the situation?

"A. He stayed like this sidewards.

"Q. I beg your pardon, like this sidewards?

"A. Sidewards leaning on the door, sidewards.

"Q. That is, he was covering part of the door?

"A. He was covering almost the whole door, sidewards like this.

"Q. But in what manner?

"A. Facing me.

"Q. Facing you?

"A. Facing me.

"Q. You were looking at him, and not at anything else?

"A. I was looking at the two of them.

"Q. You were looking at the two of them?

"A. Surely.

"Q. It was dark. Tell me, how did that dark-colored person, of whom you only saw his eyes and his straightened hair, how did he take out the money?

"A. Well, I noticed from the kitchen, when I looked towards the bar that they were aiming at Ramón's ear with a revolver, and with this hand he was pulling the cash register with fingernail, a long fingernail.

"Q. What do you mean by a long fingernail?

"A. A fingernail this long.

"Q. For the purposes of the record, about one inch or so. All of his fingernails?

"A. The fingernail he used to take the money out of the cash register was long, when with his nail he pulled the handle of the cash register and took out $200.

"JUDGE: He moves the fingers of his left hand.

"Q. Did you see the whole hand?

"A. Surely.

"Q. Were all his nails long?

"A. All, all; in this manner by the handle of the cash register.

. . . . . . . .

"Q. Were his hands white or dark-colored?

"A. They were quite dark-colored.

"Q. Tell me whether that gentleman's skin is quite dark-colored.

"A. Quite dark-colored.

"Q. Tell me whether that gentleman's hair is straightened.

"A. Not now, but it was so before.

"Q. Come here, stand up.

"A. Not now because his hair is cut, not before.

"Q. Lower your head.

"JUDGE: We cannot speak at the same time.

"Q. See if it is possible.

"JUDGE: One moment, he is showing defendant's head to the jury. He has brought him before the witness. Let us see, go on.

"Q. You say, sir, that you recognized the person you saw that night by his hair and the two eyes which you saw through a mask which he had from the forehead to the waist?

"A. Which came up to here.

"Q. Tell me if this gentleman, if it is possible that this gentleman cut his hair, could it grow . . .

"A. He had a haircut, his hair was straightened but not now.

"Q. Was it greasy? You are going to determine whether it is possible that this gentleman has such long hair as to straighten it.

"Q. Tell me if you saw the revolver's cylinder, where the bullets are.

"A. Yes.

"Q. What color was the cylinder?

"A. Black.

"Q. Tell me whether it had bullets or not.

"A. It had bullets.

"Q. You saw them also?

"A. Of the one who was in the kitchen.

"Q. From a distance of twelve feet you saw the bullets of a black cylinder?

"A. It was not from a distance of twelve feet, but from this distance.

"JUDGE: He points out approximately three and a half feet.

.     .     .     .     .     .     .

"Q. And the person who was aiming at you, was he interfering with your visibility?

"A. Well, yes, that was the one who aimed at me because I could not help the other one.

"Q. And was that the one who placed you twelve feet behind?

"A. Yes, sir.

"Q. However, you saw everything?

"A. I saw it for a moment.

"Q. The long barrel, the bullets which were sidewards . . . ?

"A. I have a twenty-twenty vision.

"Q. Tell me, how was that light which was in the cash register?

"A. Well, one could see the light, that is why I tell you this.

"Q. How was the light, was it white, red, yellow, or green?

"A. No, it was a sort of a reddish light.

"Q. A reddish light?

"A. Yes, the one on top of the cash register, a big light bulb.

"Q. Was that the only light in the cash register?

"A. The other ones are small.

"Q. What color are the other lights of the establishment?

"A. Of different colors.

"Q. Tell me the colors.

"A. Yes, I will tell you the colors.

"Q. That is what I am asking you.

"A. Green, yellow, red . . .

"Q. Go on.

"A. . . . blue, green.

"Q. There is no white light bulb inside the establishment?

"A. There is, outside.

.        .        .        .        .        .        .        .

"Q. Well, sir, finally, tell me why is it you say that you recognized that person?

"A. I repeat, by this.

"Q. By his eyes?

"A. Yes. I recognized him because on October 11 the detective went . . . . . . . . . .

.        .        .        .        .        .        .        .

"A. Your Honor, I wanted to say that after that gentleman, after they assaulted us, on October 11 the detective, two detectives, came to us showing us his picture, he was the same person I recognized that night, the same person. That was all I wanted to say; on the 11th at the General Headquarters."

The defense showed the witness a driver's license, and asked him to identify in the courtroom the person whose photograph appeared in said license. The record on this incident is the following:

"Q. See whether this person I showed you in this picture is in the courtroom.

"A. I cannot tell you, I do not see that well.

.        .        .        .        .        .        .        .

"Q. How many photographs did they show you?

"A. About three or four.

"Q. Altogether?

"A. About three or four.

"Q. Did they tell you it was this gentleman?

"A. The same one.

"Q. Did they tell you it was this gentleman?

"A. I told him that it was that one because I saw him the night of the 22nd. I told him: 'it is this very gentleman.' That is why I identified him.

"Q. Why was it that you saw Identification 1 of the defense, and you were not able to identify it.

"A. I saw him in another photograph, that photograph is dark and I cannot see it.

"Q. Look at me now.

"A. I cannot see that photograph well.

"Q. You cannot see it; that is, that you in fact do not see well? Sir, tell me if your eyes were not operated on at one time?

"A. Not yet.

"Q. When are you going to be operated on?

"A. The day will come because this eye is partially blind.

"Q. Is your right eye partially blind?

"A. Yes."

The cook Ortiz identified appellant as the person who opened the cash register, and took from it the $200 in bills which were there. In my opinion, this identification is so unreal and incredible that in effect the degree or extent of the identification is not involved, but the fact that it could not be done, and therefore said identification did not take place, because the cook:

(1) had a partially blind eye which prevented him from identifying the attorney for the defense when the latter showed him his picture in his driver's license; he testified that it was dark.

(2) when the offense was committed the light, in the place where the assault took place, was faint.

(3) the cook was in the kitchen walking backwards towards the end, about twelve feet from the cash register.

(4) he had before him one of the assailants who was aiming at him with a revolver and was making him walk backwards.

(5) he could see the cash register over the shoulder of the man who was aiming at him and who was covering almost all the space of the half-opened door between the kitchen and the bar.

(6) the man who opened the cash register was using a mask which covered all of his features.

(7) he only saw the straightened hair and the eyebrows, but at the trial appellant had short hair. He testified that he recognized him by his bushy eyebrows, a common characteristic in many persons.

(8) it is too incredible that he could see, under those circumstances, from the kitchen, the thief's act of taking the $200 in bills from the cash register.

I assume that the jury returned a verdict of guilty because it had one concern, the same one which the majority of the court undoubtedly had when in this case it rendered its judgment that "it is sufficient that a thief wear a mask in order to obtain his immunity." But if such a concern exists, it is not in keeping with reality. This case presents a series of exceptional circumstances, which can hardly duplicate themselves to the extent of rendering an identification impossible in other cases.

The identification is an essential element in this proceeding. The guilt or innocence of appellant depends exclusively on his identification. There is the possibility that an innocent person be convicted when there exists a reasonable doubt of his guilt. It is necessary to remember that identification based on photographs or lineups is not conclusive because when the witness is placed under those circumstances, his tendency is to identify someone. Which means that the identification, on some occasions, has to be considered with suspicion and not

as being conclusive. *United States* v. *Wade*, 388 U.S. 218, 228 (1967). Under the circumstances of this case, the identification is a product of the imagination of the witness-cook who was overtaken by the very common and praiseworthy desire to discover the author of the offense.

Therefore, I conclude that we should have reversed the judgment in this case.